UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Case No. 11-58953

MICHAEL E. McINERNEY,                                     Chapter 7

                    Debtor.                               Judge Thomas J. Tucker
_____/

CHARLES E. BECKER, et al.,

                    Plaintiffs,
                                                          Adv. Pro. No. 12-5386
v.

MICHAEL E. McINERNEY,

                    Defendant.
_____/

GENE R. KOHUT, TRUSTEE,

                    Plaintiff,

v.                                                        Adv. Pro. No. 13-4342

MICHAEL E. McINERNEY,

                    Defendant.
_____/

**TRIAL OPINION**

## I. Introduction

In these two adversary proceedings, which were consolidated for purposes of pretrial

proceedings and trial,[1] the Plaintiffs seek denial of Debtor/Defendant Michael E. McInerney's

---

[1] *See* Docket # 45 in Adv. Pro. No. 13-4342 ("Order Consolidating Adversary Proceedings for
Purposes of Pretrial Proceedings & Trial").

("Debtor's") discharge in his Chapter 7 case.[2] Charles E. Becker, Becker Ventures, LLC, and

Charles E. Becker, Trustee under Trust Agreement of Charles E. Becker dated September 16,

1977, as Amended (collectively, the "Becker Parties"), the plaintiffs in Adv. Pro. No. 12-5386,

seek denial of Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3),

727(a)(4)(A), 727(a)(4)(D), 727(a)(6)(A), 727(a)(6)(C) and 727(a)(7). Gene R. Kohut, Trustee,

the plaintiff in Adv. Pro. No. 13-4342, and the Chapter 7 Trustee in Debtor's bankruptcy case

(the "Trustee"), seeks denial of Debtor's discharge only under 11 U.S.C. § 727(a)(4)(A).

On December 3 and December 17, 2013, the Court held a bench trial in these two

adversary proceedings.[3] Based on a review of the evidence presented during the trial, the Court

finds and concludes that Plaintiffs have established all of the elements for denial of discharge

under 11 U.S.C. § 727(a)(4)(A) by a preponderance of the evidence. The Court will therefore

enter judgment denying Debtor's discharge under 11 U.S.C. § 727(a)(4)(A).[4]

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C.

§§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core

proceeding under 28 U.S.C. § 157(b)(2)(J). This matter also is "core" because it falls within the

definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under

title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these

---

[2] When "Plaintiffs" is used in this opinion, it refers to the plaintiffs in both adversary proceedings, collectively.

[3] Transcripts of the consolidated trial are on file at Docket ## 73 and 81 in Adv. Pro. No. 13-4342.

[4] Because the Court finds and concludes that Debtor's discharge must be denied under 11 U.S.C. § 727(a)(4)(A), the Court will not discuss the merits of the Becker Parties' other § 727(a) claims.

categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This matter is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *id.*, namely, the 11 U.S.C. § 727(a) provisions discussed below. And this matter is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *Id.*

## III. Background and stipulated facts

On July 12, 2011, Debtor filed a voluntary petition for relief under Chapter 11, commencing Case No. 11-58953. The Becker Parties filed their adversary proceeding seeking denial of Debtor's discharge on July 30, 2012. The Chapter 11 case was later converted to Chapter 7, on November 2, 2012. The Chapter 7 Trustee filed his adversary proceeding seeking denial of Debtor's discharge, on March 25, 2013.

The parties have stipulated that on more than one occasion, the Debtor made false statements in the schedules and Statement of Financial Affairs that he filed in his bankruptcy case. Debtor, the Trustee, and the Becker Parties stipulated to the following facts, as stated in the final pretrial order, which the Court incorporates into its findings of fact and conclusions of law. Debtor is referred to sometimes in the final pretrial order as "Defendant."

> 2. Defendant signed and filed his initial Schedules and Statement of Financial Affairs dated July 26, 2011 ("Initial Schedules") [Case No. 11-58953, Docket No. 14].

> 3. Defendant signed and filed amended Schedules and Statement of Financial Affairs on November 11, 2011 ("First Amended Schedules") [Case No. 11-58953, Docket No. 100].

3

4. Defendant signed and filed an amended Schedule C on April 16, 2013 ("Second Amended Schedules," and collectively with the Initial Schedules and First Amended Schedules, "Schedules") [Docket No. 516].

5. Defendant's Initial Schedules failed to disclose a wedding band, a Bertolucci watch, and a cause of action against MEM Investments, LLC.

6. Defendant filed his First Amended Schedules on November 11, 2011, listing the watch, wedding band, and claim against MEM Investments, LLC.

7. The following items were not disclosed in Defendant's Schedules: (a) an alleged pre-petition agreement with Fitzpatrick Technologies LLC ("Fitzpatrick Agreement"); (b) an alleged pre-petition services contract/agreement with Roncelli, Inc. ("Roncelli Agreement"); (a) a pre-petition payment by the Cardinal Club of Detroit to Defendant's Bloomfield Hills Country Club in the amount of $11,581.36 ("Cardinal Club Payment"); (b) a lease agreement for a 2009 BMW 5 Series vehicle ("BMW Lease"); and (c) a mortgage against Defendant's Bloomfield Hills, Michigan residence in favor of Becker Ventures, LLC ("Becker Mortgage").

8. Defendant's Initial Schedules and First Amended Schedules did not disclose the Revocable Living Trust of Michael E. McInerney [dated] March 3, 1989 ("McInerney Trust").

9. Defendant filed the Second Amended Schedules on April 16, 2013 listing the McInerney Trust.

10. Defendant was questioned by the Trustee and Trustee's counsel at his 11 U.S.C. § 341 hearing on November 28, 2012 about the truthfulness of his Schedules and encouraged to amend his Schedules to correct any inaccuracies or deficiencies.[5]

In addition, Debtor and the Becker Parties stipulated to the following facts:

10. Debtor is an attorney.

---

[5] Joint Final Pretrial Or. (Docket # 56 in Adv. Pro. No. 13-4342) at 4-5 ¶¶ 5(a)2-10 (Uncontested Facts (as to Trustee and Defendant), 5-7 ¶¶ 5(b)1-9 (Uncontested Facts (as to [the] Becker [Parties] and Defendant)).

4

11. Debtor's Schedule B did not disclose the following items:

      a. A wedding band;

      b. A Bertulucci watch;

      c. An alleged claim against MEM Investments, LLC;

      d. Artwork;

      e. Interests in University of Michigan football tickets and/or their accompanying seat licenses; and

      f. Ownership/membership interests in the following: (i) Bloomfield Hills Country Club; (ii) Detroit Athletic Club; (iii) Cardinal Club; (iv) State Bar of Michigan; and (v) The Revocable Living Trust of Michael E. McInerney, dated March 3, 1989.[6]

## IV. Discussion

### A. The law: 11 U.S.C. § 727(a)(4)(A)

The Becker Parties and the Trustee both seek denial of Debtor's discharge under 11 U.S.C. § 727(a)(4)(A), based on Debtor's failure to disclose in his bankruptcy schedules and Statement of Financial Affairs the property listed above in the parties' stipulated facts, which the Plaintiffs allege was property of the bankruptcy estate. Section 727(a)(4)(A) provides:

      (a) The court shall grant the debtor a discharge, unless–

      . . .

      (4) the debtor knowingly and fraudulently, in or in connection with the case--

---

[6] *Id.* at 7 ¶¶ 5(b)10-11 (Uncontested Facts (as to [the] Becker [Parties] and Defendant)).

5

(A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A).

> In order to deny a debtor discharge under [11 U.S.C. § 727(a)(4)(A)], a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.

*Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000) (citation omitted). The parties agree that the elements listed in the *Keeney* case as element nos. 1, 2, and 5 are satisfied in this case with respect to all of the items the Debtor failed to disclose, listed in the stipulations quoted in Part III of this opinion. That is, Debtor made statements under oath, which were false, and which related materially to Debtor's bankruptcy case.[7] What remains at issue in this case is whether Debtor made the false statements knowingly (element 3), and with fraudulent intent (element 4).

> [N]ot caring whether some representation is true or false—the state of mind known as "reckless disregard"—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material.

*In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)(citations omitted).

> [I]ntent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." A reckless disregard as to whether a representation is true will also satisfy the [fraudulent] intent requirement. "'[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case.'" However, a

---

[7] *See* at 7-8 ¶¶ 5(c)(Undisputed Points of Law (as to Trustee and Defendant))-(d)(Undisputed Points of Law (as to [the] Becker [Parties] and Defendant)).

debtor is entitled to discharge if false information is the result of
mistake or inadvertence.

*Keeney,* 227 F.3d at 685-86 (citations omitted).

In a recent bench opinion in *McDermott v. Schwenck* (*In re Schwenck*), this Court
interpreted *Keeney* as requiring the Court to employ a "totality of circumstances" test to
determine whether the "fraudulent intent" element of § 727(a)(4)(A) has been satisfied. (*See*
Docket # 30 in Adv. Pro. No. 13-4701 (Tr. of Opinion on Trustee's Mot. for Summ. J.) at 14-17.)
Under that test, a finding that a debtor had a "reckless disregard as to whether a representation is
true," does not, standing alone, *require* the court to find that the "fraudulent intent requirement"
of § 727(a)(4)(A) has been established. Rather, whether a debtor had a "reckless disregard as to
whether a representation is true," is one factor among others that a court may consider in
determining whether to draw an inference of fraudulent intent on the part of a debtor. *Id.* In
other words, the Court *may*, but

> is not required to make a finding of fraudulent intent solely because
> the plaintiff has shown a reckless disregard by the debtor as to
> truth, ultimately it's all the facts and circumstance that the Court
> must consider to determine whether the debtor is guilty of actual
> fraudulent intent and fraudulent intent under <u>Keeney</u> . . . mean[s]
> actual intent to defraud, such as an actual intent by the debtor to
> conceal, for example, an asset that the debtor wants to keep . . . for
> his or herself and not lose to the administration of the bankruptcy
> case by disclosing it.

(*Id.* at 17.)

This Court interprets *Keeney* and similar cases as permitting, but not requiring, a finding
of fraudulent intent if the debtor is guilty of reckless disregard for the truth. "[Fraudulent intent]
can be found based on 'the cumulative effect of a series of innocent mistakes which evidence a

7

pattern of reckless and cavalier disregard for the truth.'" *Sheehan & Associates PLC v. Lowe*, No. 12-11768, 2012 WL 3079251, at *7 (E.D. Mich. July 30, 2012)(citation omitted), *aff'd,* 518 Fed. Appx. 348 (6th Cir. March 22, 2013); *see also Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992) (footnote omitted) (citation omitted) (holding that the bankruptcy court's findings "that the existence of more than one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive [under § 727(a)(4)(A)]" were "supported by the record and are not clearly erroneous"); *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 112 (1st Cir. 1987) (footnote omitted) (citation omitted) (holding that "there was ample evidence in the record to support a reasoned conclusion by the bankruptcy judge that [the debtor] exhibited the 'reckless indifference to the truth,' which has consistently been treated as the functional equivalent of fraud for purposes of §727(a)(4)(A)"); *Stevenson v. Taylor* (*In re Taylor*), 461 B.R. 420, 423 (E.D. Mich. 2011) (quoting *Keeney*, 227 F.3d at 685-86)("The Sixth Circuit has provided that '"intent to defraud' involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression' [and] . . . '[a] reckless disregard as to whether a representation is true will also satisfy the intent requirement.'"); *Stevenson v. Cutler* (*In re Cutler*), 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003) (citation omitted) (explaining that "[a] series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive . . . [but that] the discharge is not to be denied when the untruth was the result of a mistake or inadvertence"); *March v. Sanders* (*In re Sanders*), 128 B.R. 963, 972 (Bankr. W.D. La. 1991) (citations omitted)

8

(explaining, in relevant part, that under § 727(a)(4)(A), "[t]he statement under oath must be known by its maker to be false and be made willfully (rather than inadvertently) with an intent to defraud"; that "[t]his intent [to defraud] may be established by circumstantial evidence"; and that "[s]tatements made with reckless indifference to the truth are regarded as intentionally false").

In an analogous context, in *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013), the United States Supreme Court recently held that "defalcation" under 11 U.S.C. § 523(a)(4) must be treated similarly to the way "fraud" is treated in that section; that fraud requires a showing of "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong;" but that an intentional wrong includes "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind that the criminal law often treats as the equivalent [of an intentional wrong];" and that reckless conduct for purposes of § 523(a)(4) is when a "fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty"). *See also Shapiro v. Plante & Moran, LLP (In re Connolly North America, LLC)*, 376 B.R. 161, 184 (Bankr. E.D. Mich. 2007) (citations omitted) (discussing levels of culpability in the context of a failure to comply with discovery obligations) ("'Reckless disregard' . . . is '[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others, and by a conscious (and sometimes deliberate) disregard for or indifference to that risk.'")

## B. Debtor's general position

Debtor argues that his numerous false statements — his failure to disclose the various assets and liabilities in his schedules and Statement of Financial Affairs — were due to a combination of innocent mistake, inadvertence, faulty memory, and in some cases, his sincere

belief that disclosure was not required. Debtor notes that the Trustee has not sought turnover of any of the assets he failed to disclose, and has made no attempt to administer the assets for the benefit of the estate. According to Debtor, this is because the undisclosed assets had little or no value above what Debtor could exempt, and thus were "undisputedly worthless to the estate." Debtor alleges that he made no attempt to hide any of the undisclosed assets, and had nothing to gain by not disclosing them, because he could have claimed them as exempt. Debtor argues that given these facts, and considering the totality of the circumstances, the Trustee and the Becker Parties have failed to satisfy their burden of establishing the "knowledge" and "fraudulent intent" elements of § 727(a)(4)(A).

### C. The general positions of the Chapter 7 Trustee and the Becker Parties

The Chapter 7 Trustee and the Becker Parties argue that the totality of circumstances establish that Debtor knowingly, and with fraudulent intent, failed to disclose assets and liabilities in his bankruptcy schedules and Statement of Financial Affairs in an effort to benefit himself and creditors who were his friends, and to make it difficult for other creditors like the Becker Parties, who were hostile to him, to recover on their claims.

The Trustee argues that Debtor's pleas of innocent mistake, inadvertence, or belief that he was not required to disclose certain assets, are not credible. This is so, the Trustee says, because the Debtor is a licensed attorney, who practiced both business and real estate law, was involved in multi-million dollar merger and acquisition cases, had previously filed a bankruptcy petition and completed schedules on behalf of a corporate debtor, and was represented by competent bankruptcy counsel for the first several months in his own case. The Trustee alleges further that Debtor's testimony is not credible, because (1) Debtor lied about his post-petition marketing of

10

technology for Fitzpatrick Technologies LLC; (2) Debtor admitted in writing to having committed fraud against the Bush, Seyferth & Paige law firm, one of the largest creditors in Debtor's bankruptcy case and his former counsel in litigation against the Becker Parties; and (3) Debtor gave no legally valid reason for failing to disclose any of the undisclosed assets. The Trustee alleges further that Debtor's pattern of conduct, which included disobeying court orders, surreptitiously and wrongfully using property of the estate for his own benefit, and refusing to schedule undisclosed assets and liabilities despite filing multiple amendments to his schedules, shows a reckless disregard for the truth and for his duties under the Bankruptcy Code and Rules.

The arguments of the Becker Parties echo those of the Trustee. And the Becker Parties argue that although a debtor's failure to disclose a few minor assets or liabilities on his schedules and Statement of Financial Affairs, under certain circumstances, could possibly be attributed to mistake, inadvertence, faulty memory, or ignorance on the part of the debtor that the assets and liabilities needed to be disclosed, the Debtor's nondisclosures of such a large number of assets and liabilities, which clearly were required to disclosed, and which were discussed during multiple proceedings, cannot be attributed to mistake, inadvertence, faulty memory, or ignorance on the part of this Debtor. The Becker Parties allege that Debtor's pattern of scheduling dubious liabilities to friends while refusing to schedule liabilities owing to hostile creditors, such as his refusal to schedule the Becker Mortgage, when he was an experienced real estate attorney "with a very clear working knowledge of the requirements of mortgages," and his failure to offer any legitimate and credible excuse for such conduct, demonstrates that Debtor made a conscious and deliberate decision regarding which assets and liabilities to disclose, with a fraudulent intent.

### D. The Court's further findings and conclusions

The Court finds and concludes that the Debtor did make several false statements material to his bankruptcy case under oath, both knowingly and with fraudulent intent. These include the following.

**1. Debtor's failure to disclose, in his initial Schedule B, his Bertolucci watch and his wedding ring, and Debtor's false testimony at the first meeting of creditors**

Debtor failed to list either his Bertolucci watch or his wedding ring in his initial Schedule B, filed July 26, 2011, either in response to Item 7, "Furs and jewelry" (where Debtor checked "None") or in response to Item 35, "Other personal property of any kind not already listed. Itemize."[8]  In this way, Debtor made a false statement under oath that was material to his bankruptcy case. The Debtor has so stipulated, and the evidence clearly supports these conclusions.[9]  After he was questioned about these items in his first meeting of creditors on August 19, 2011, Debtor filed an amended Schedule B, which listed both the watch and the ring at Item 7, with values of $500.00 (later amended to $900.00) for the watch and $250.00 for the ring.[10]

The Court finds that these false statements were made knowingly and with fraudulent intent. Debtor knew he owned these items when he signed and filed his initial Schedule B, and

---

[8]  TX 101.  In this opinion, the Trustee's trial exhibits are cited as 'TX__' and the Becker Parties' exhibits are cited as "CX__."

[9]  The Sixth Circuit defines the materiality element under § 727(a)(4)(A) as meaning that the item "'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property'". *Keeney*, 227 F. 3d at 686 (citation omitted).

[10]  TX 102; TX 103.

they were important to him.  Furthermore, the Debtor is a long-time licensed attorney, and a person who the Court perceives, from observing the Debtor in many hearings and in his testimony at trial, to be a very intelligent person.  It was known and obvious to the Debtor when he filed his initial Schedule B that his watch and wedding ring were "jewelry" within the meaning of Item 7 on Schedule B, but he checked "None" at Item 7, indicating that he owned no jewelry.  Even if the Debtor had truly believed that these items were not "jewelry" — which Debtor did not — Debtor still knew that he had to list these items, if nowhere else, at line 35 on Schedule B, which required the Debtor to list "Any other personal property of any other kind not already listed" and to "itemize" such property.  Debtor's failure to list his watch and his wedding ring in his initial Schedule B could not have been an inadvertent mistake.

This conclusion is reinforced by the fact that, as the Court now finds, when the Debtor was questioned about his watch and his wedding ring during his first meeting of creditors, on August 19, 2011, he testified falsely under oath about why he had not listed them in his Schedule B.  He was asked about the watch he was wearing, and then after he admitted to owning a wedding ring, he was confronted with a question suggesting that his Schedule B, Item 7 was false because no jewelry was listed.  In response, Debtor testified "I don't consider a watch to be jewelry.  I consider it to be a functional piece of business equipment."[11]  The Court finds this to be a false and frivolous answer.  Of course Debtor's watch, which he valued at $500.00 in his amended Schedule B and at $900.00 in his second amended Schedule B, is "jewelry."  And the Court finds that the Debtor testified falsely when he testified under oath at his first meeting of creditors that he did not consider his watch to be jewelry.

---

[11]  TX 105 at 30.

13

Then, when asked about his wedding ring, specifically the question "[d]o you consider your wedding ring to be a piece of functional equipment?" Debtor testified "I don't consider it to be jewelry. . . . I consider it to be a token of my wife's affection."[12]  This, too, was a false and frivolous answer.  Clearly Debtor's wedding ring is "jewelry," and Debtor knew it.

It is true that when the Debtor filed his amended Schedule B, listing his watch and wedding ring as jewelry, Debtor also claimed an exemption for the full stated value of the watch and the ring, in Debtor's amended Schedule C.  From this, one might wonder what motive the Debtor could have had to try to conceal the watch and the wedding ring by not listing them in his initial Schedule B, since he could exempt them fully.  The answer to this lies in the fact that, as the Debtor testified at trial, he did not understand or know about the law of exemptions in bankruptcy cases.[13]  Debtor did not know that he could fully exempt his watch and his wedding ring when he chose to falsely omit those items from his initial Schedule B.

The Court finds that Debtor knowingly and with fraudulent intent made false statements under oath material to his bankruptcy case, when he failed to list his watch and his wedding ring in his initial Schedule B, *and* when he testified at his first meeting of creditors, under oath, about the watch and the ring, as described above.  This alone is sufficient to deny Debtor's discharge under § 727(a)(4)(A).  But there is more.

---

[12]  *Id.*

[13]  Tr. (Docket # 73) at 199.

## 2. The Debtor's failure to list his BMW vehicle lease in his initial Schedule G, which Debtor has never amended

When he filed his bankruptcy case, and thereafter, Debtor was leasing a 2009 BMW 5 series vehicle that he regularly drove as his primary vehicle. The first line of instruction on Schedule G required the Debtor to "Describe all executory contracts of any nature and **all unexpired leases of** real or **personal property**." (Emphasis added). Debtor checked the box indicating that he had no executory contracts or unexpired leases.[14] And Debtor did not list his BMW vehicle lease. The Debtor has never amended his Schedule G to correct this false statement. The Debtor has stipulated that this was a false statement, under oath, and that it was material to the bankruptcy case. The Court so finds, based on the stipulation and the evidence at trial. In addition, the Court finds that this false statement was made knowingly and with fraudulent intent.

As with his wedding ring and the $900.00 watch that he wore, the Debtor could not have forgotten about his BMW vehicle lease when he completed, signed, and filed his Schedule G. Nor could the Debtor have forgotten, at all times after filing his initial Schedule G, that he had this unexpired vehicle lease when he filed his bankruptcy case. Debtor testified that this vehicle was the primary vehicle he drove on a regular basis. And he could not have forgotten that he had an unexpired lease for this vehicle. Indeed, in a deposition taken on March 5, 2012, when asked why he did not listed the 2009 BMW in his Schedule B, Debtor testified that this was because he did not own it, but rather leased it.[15]

---

[14] TX 101.

[15] TX 106 at 57-58.

Debtor testified at trial that he did not understand what "executory contract" means in bankruptcy law.[16]  Even if that is so, the Debtor still must have understood, and the Court finds that the Debtor did understand, when he filed his initial Schedule G, that his BMW vehicle lease was an "unexpired lease of. . . personal property" within the meaning of the instructions on Schedule G, so that the BMW lease had to be listed there.  As a long-time licensed attorney and one with substantial experience in real estate law and sophisticated corporate transactions, Debtor certainly knew what an unexpired lease of personal property was, and that his BMW vehicle lease fit within that description.

Debtor testified at trial that he did not believe that the BMW vehicle had any value to him or to the bankruptcy estate, because it was subject to a lease.  But this is not a credible explanation for Debtor's failure to list the BMW lease in Schedule G.  The description of what must listed in Schedule G, quoted above, is absolutely clear and gives no indication whatsoever that an unexpired lease of personal property need not be listed if it has no value, or if the Debtor thinks that it has no value.  As a licensed attorney, and as noted above, a very intelligent person, the Debtor could not have, and did not, think that he did not have to list his BMW vehicle lease in Schedule G.

After admitting the obvious fact that he knew what a lease was, Debtor testified that when he was filling out Schedule G, he did not understand that this was "where you would list unexpired leases or leases that were in effect at the time."[17]  This answer is simply not credible. The wording of the instructions at the beginning of Schedule G, quoted above, could not have

---

[16]  Tr. (Docket # 73) at 199.

[17]  Tr. (Docket # 73) at 57.

16

been clearer, especially to this experienced and intelligent attorney, and the Court finds that Debtor's testimony at trial that he did not understand this was simply false.

Moreover, several months before filing his Schedule G in his bankruptcy case, the Debtor had reviewed and signed, on behalf of MEM Investments, LLC, in that company's Chapter 11 case, a Schedule G that listed unexpired real estate leases.[18]

Given the evidence, the Court concludes that the Debtor knowingly made a false statement when he failed to list his BMW vehicle lease in Schedule G. And because he knew that it must be listed, and knowingly failed to list it, the Court infers that the Debtor must have had, and did have, a fraudulent intent in making this false statement. The Debtor has given no other credible explanation for his failure to disclose this vehicle lease.

### 3. Debtor's failure to list in his initial Schedule B his $290,000 claim against MEM Investments, LLC

For some time before Debtor filed his own bankruptcy case, a company of which the Debtor was indirectly the 95% owner, MEM Investments, LLC, had been in its own Chapter 11 bankruptcy case in this Court. When he filed his bankruptcy case, Debtor had a claim against MEM Investments, LLC, that he later valued at $290,000. We know this, in part, because in his *amended* Schedule B, filed November 11, 2011, Debtor listed this claim, and stated that its "current value" was $290,000, in response to question 35 of Schedule B, which required Debtor to list "[o]ther personal property of any kind not already listed."[19]  In his initial Schedule B, however, Debtor did not list this claim, at Item 35, or anywhere else. Debtor has stipulated, and

---

[18] TX 121; Tr. (Docket # 73) at 72-73.

[19] TX 102.

the Court finds from the evidence, that this was a false statement under oath that was material to his bankruptcy case. The Court also finds that this false statement in Debtor's initial Schedule B was made knowingly and with fraudulent intent.

Debtor testified that when he filled out his initial schedules in his bankruptcy case he thought that an "asset" meant real or personal property that has some actual value, as opposed to property that has no value. And he testified that he later disclosed his claim against MEM Investments in his *amended* Schedule B because "I was advised that as an asset, even though it was — it had no value at that point in time, that it needed to be scheduled."[20] From this, the Court gleans that the Debtor is saying that he did not list his claim against MEM Investments, which he valued in his amended Schedule G at $290,000, in his initial Schedule G because at that time he thought his claim had no value.

But the Court finds that this explanation is false. First, the instructions on Schedule B, at the very beginning, state that the Debtor is to "list all personal property of the debtor of whatever kind," without making any reference to whether or not the property has value.[21] And there is no hint anywhere in the numbered list of the 35 types of property on the Schedule B form that property is to be listed only if it has value. Rather, Item 21 on the Schedule B form requires the Debtor to list "[o]ther contingent and unliquidated claims of every nature," and Item 35 on the form requires Debtor to list "[o]ther personal property of any kind not already listed." Second, Debtor *did* list other property in his initial Schedule G that he said had a "0.00" current value,

_____

[20] Tr. (Docket # 73) at 82.

[21] And the law is clear that a bankruptcy debtor must disclose all of his property in his schedules, even property that the debtor thinks has no value. *See, e.g., In re Opra*, 365 B.R. 728, 740 (Bankr. E.D. Mich. 2007).

namely at Item 13, Debtor's ownership interest in "MEM Investments, LLC 95%." That completely undermines Debtor's assertion that the thought property need not be listed in Schedule B if it had no value.

Thus, the Court concludes that the Debtor knowingly and fraudulently made a false statement under oath when he failed to list his $290,000 claim against MEM Investments, LLC in his initial Schedule B. And Debtor made another false oath under § 727(a)(4)(A), in his testimony at trial, when he knowingly gave a false explanation of his failure to list this property in his initial Schedule B.

### 4. Debtor's failure to disclose his interest in an oral agreement with Fitzpatrick Technologies LLC

The Court finds, from the evidence at trial, that at the time of his bankruptcy petition in this case, and at all times thereafter, Debtor had an oral agreement with Fitzpatrick Technologies LLC ("Fitzpatrick"). Under that oral agreement, which the Debtor made with the members of Fitzpatrick no later than 2008, the Debtor was to help Fitzpatrick try to market Fitzpatrick's technology in certain plastic pallets and pallet components, and the Debtor is to receive from Fitzpatrick between 8-10% of all revenue Fitzpatrick realizes from any sales of such technology.[22] This interest should have been disclosed in Debtor's initial Schedule B, at line 35 if not elsewhere, but it was not disclosed.[23] Nor did Debtor disclose this interest in his amended

---

[22] The Court finds these facts based on the Debtor's testimony at trial, and the trial testimony of Michael Stechschulte, the managing member of Fitzpatrick, and the Debtor's deposition testimony given on August 23, 2012 (Tr., CX 22, at 65-67), and the August 28, 2012 deposition testimony of Michael Stechschulte (Tr., CX 23, at 23). And in his deposition taken on July 24, 2013, Debtor testified that while at the time he filed his bankruptcy petition he did not think his interest in this agreement with Fitzpatrick had any value, at one point in time, he thought it might be worth "a hundred grand." (Tr., TX 104, at 46.)

[23] TX 101.

Schedule B, filed on November 11, 2011 or in his second amended Schedule B filed on April 16, 2013.[24]  To this day, Debtor has never amended his Schedule B or any other schedules to disclose his interest under this oral agreement with Fitzpatrick.

Debtor's initial Schedule B, and his first and second amended Schedules B, each contain false statements made under oath, material to the bankruptcy case, which the Court finds were made knowingly and with fraudulent intent by the Debtor.  In his trial testimony, Debtor claimed that he did not disclose his oral agreement with Fitzpatrick because, in essence, it was something less firm and formal than an actual agreement; because efforts to market the technology of Fitzpatrick had been dormant for quite some time at the time he filed his bankruptcy petition; because Fitzpatrick has never realized any revenue from the marketing of its pallet technology; and because any potential that the Debtor had under his oral understanding with Fitzpatrick had a value of zero as of the petition date, and thereafter.

Contrary to Debtor's testimony, the Court finds that when he filed his bankruptcy petition and at all times thereafter through the present, Debtor knew and believed that he had an enforceable oral agreement with Fitzpatrick, described above, and that the efforts to market Fitzpatrick's pallet technology still might come to fruition, such that Fitzpatrick will realize revenue, and Debtor will be entitled to receive 8-10% of that revenue.  At the petition date, and at all times thereafter, the Debtor knew that he had property in the form of his interest under this oral agreement with Fitzpatrick, and he knew and believed that it may well be worth something, although he did not know how much.  Debtor did not disclose this property interest because he wanted to keep it under the radar, so to speak — out of the reach of creditors in this bankruptcy

---

[24]  TX 102, 103.

case — and keep it for himself so that if Fitzpatrick's marketing efforts do pan out some day, the Debtor would have a potentially important source of income.

These findings are supported by the facts and evidence already stated, as well as by the fact that in a pre-trial deposition the Debtor himself characterized his oral agreement with Fitzpatrick as a "verbal agreement."[25]   Moreover, Debtor obviously did not believe that his agreement with Fitzpatrick was unenforceable simply because it was oral.   Debtor's claim against Charles E. Becker, which the Debtor listed at Item 35 in his initial Schedule B and in each of his amended Schedules B, which Debtor valued at $14.5 million, is based entirely upon an *oral agreement* that Debtor says he had with Charles E. Becker.   And the Court's discussion in subsection 3 above, regarding Debtor's false and improper allegation that he thought he did not need to list property that he thought had no value, applies here as well.   Finally, Debtor admits that, as late as February 2012, well after the petition date in this case, he made efforts to market Fitzpatrick's pallet technology.[26]   This also undercuts Debtor's explanation for never scheduling this property.

### 5.   Other false statements

The foregoing discussion is amply sufficient to require the Court to deny Debtor's discharge under § 727(a)(4)(A).   For that reason, the Court will not discuss in detail other false statements that were made in Debtor's schedules and Statement of Financial Affairs, including: (1) Debtor's failure to list in his initial Schedule D, or ever to amend his Schedule D to list, the

---

[25]  Debtor so testified in his August 23, 2012 deposition (Tr., CX 22, at 66).

[26]  At first, Debtor denied this in his testimony at trial.  But after he was confronted with evidence of certain e-mails, he admitted it.  Tr. (Docket # 73) at 104-07; CX 58, 61.

second mortgage that Debtor and his wife gave to Becker Ventures L.L.C. on Debtors' home in

Bloomfield Hills, Michigan, which was recorded in 2006;[27] (2) Debtor's failure to list the Becker

Parties' lawsuit and pre-petition judgment against Debtor in answering question 4 in the

Statement of Financial Affairs;[28] and (3) Debtor's failure to list his interest in the Revocable

Living Trust of Michael E. McInerney, in either his initial Schedule B or in his first amended

Schedule B.[29]  It is sufficient to say, with respect to these other false statements, that they show,

at a minimum, a reckless disregard by the Debtor for the truth of his schedules and Statement of

Financial Affairs.  From that, in turn, the Court draws the inference that Debtor's other false

statements, discussed above, were done with fraudulent intent.  *See* discussion and cases in part

IV-A of this opinion.

### 6.  Further comment regarding Debtor's credibility

The Court notes that although it would make the same findings and conclusions that it has

made in this opinion, above, without the following, the following evidence seriously damaged

Debtor's credibility during the trial of these cases.  And the following further supports the

Court's findings and conclusions above.

Before Debtor filed this bankruptcy case, he was sued in the Oakland County Circuit

Court by the law firm Bush Seyferth & Paige, for fraud.  Debtor consented to a judgment for

$300,000 in favor of the Bush Seyferth firm, and a consent judgment was entered on or about

---

[27]  TX 107.

[28]  TX 101.

[29]  Debtor finally listed this at Item 20 in his second amended Schedule B, which was not filed
until April 16, 2013 (TX 103).

May 23, 2011.[30]  In connection with that consent judgment, Debtor signed a settlement agreement

with the Bush Seyferth firm dated April 26, 2011, in which the Debtor specifically admitted "that

he committed fraud in the manner alleged by [Bush Seyferth in its complaint]" and specifically

admitted "the truth of the allegations set forth in paragraphs 35 through 67 [of the Bush Seyferth

complaint]."[31]  Thus, Debtor admitted in writing the following allegations: that the Debtor

induced Bush Seyferth to agree to represent him, and to continue representing him, in Debtor's

litigation against the Becker Parties, by knowingly making false representations to Bush Seyferth

that Debtor had set aside funds to pay Bush Seyferth for the litigation, but Debtor knew these

statements were false when he made them.  Debtor further admitted, as the complaint alleges,

that Debtor induced Bush Seyferth to represent him in the Becker litigation by promising to pay

their fees, estimated to be in the range of $300,000 to $500,000 or more, but Debtor did not

intend to keep that promise when he made it.

## IV.  Conclusion

For the reasons stated in this opinion, the Court will enter a judgment in these

consolidated adversary proceedings, on Plaintiff Kohut's Complaint and on Count V of the

Becker Parties' Complaint, denying Debtor a discharge under 11 U.S.C. § 727(a)(4)(A).  All

other remaining counts in the Becker Parties' Complaint will be dismissed, without prejudice.


**Signed on April 11, 2014**　　　　　　　　　　**/s/ Thomas J. Tucker**
　　　　　　　　　　　　　　　　　　　　　　　　**Thomas J. Tucker**
　　　　　　　　　　　　　　　　　　　　　　　　**United States Bankruptcy Judge**

---

[30]  TX 120, Judgment.

[31]  *Id.*, Settlement Agreement and Stipulation of Facts at 1 ¶ 1.

23